### UNITED STATES of America

v.

### Gerald OLGIN, Marilyn Olgin, Jerome Shapiro, James F. O'Brocta.

### Appeal of James F. O'BROCTA.

### No. 83–5702.

United States Court of Appeals,
Third Circuit.

Argued April 23, 1984.

Decided Oct. 2, 1984.

Robshaw & Abramowitz, P.C., Philip B. Abramowitz, of counsel (Argued), Buffalo, N.Y., for appellant.

Glenn L. Archer, Jr., Asst. Atty. Gen., Michael L. Paup, Robert E. Lindsay, James P. Springer (Argued), Attys., Tax Div., Dept. of Justice, Washington, D.C., for appellee; J. Alan Johnson, U.S. Atty., Pittsburgh, Pa., of counsel.

Before ADAMS and BECKER, Circuit Judges, and SAROKIN, District Judge.*

## OPINION OF THE COURT

ADAMS, Circuit Judge.

James O'Brocta has been convicted of conspiring to defraud the United States by impeding the Internal Revenue Service's efforts to ascertain and collect revenue in violation of 18 U.S.C. § 371 (1982). He has also been convicted of three counts of willfully assisting in the filing of and subscribing to false corporate income tax returns in violation of 26 U.S.C. § 7206 (1982).[1] O'Brocta was sentenced to concurrent terms of imprisonment on the conspiracy and the substantive counts; these terms were suspended by the trial judge, and concurrent periods of probation were imposed for each count. A fine was also imposed.

O'Brocta argues on appeal that the evidence adduced against him at trial is insufficient to support a conviction for conspiracy and that the trial judge's comments during the charge so tainted the jury's verdict as to deprive him of an adequate opportunity to defend himself. We cannot agree with O'Brocta's contentions and the convictions will therefore be affirmed.

### I.

O'Brocta is president of a salvage company whose business is the buying and selling of scrap metal. Between 1975 and 1978, O'Brocta regularly sold scrap to Penn Iron and Metals Company. Gerald Olgin, the

---

* Hon. H. Lee Sarokin, United States District Court for the District of New Jersey, sitting by designation.

1. The Internal Revenue Code provides that any person who

   [w]illfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or ... [w]illfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge, or consent of the person authorized or required to present such return, affidavit, claim, or document; ... shall be guilty of a felony.

   26 U.S.C. § 7206 (1982)

president of Penn Iron, testified at O'Brocta's trial that, when a seller of scrap asked for payment in cash, the firm would write a check to a fictitious payee, cash the check, and pay the seller. O'Brocta frequently received payment under this scheme, and he frequently personally cashed the checks drawn to the order of fictitious payees. O'Brocta did not include in his corporate records the receipts from sales of scrap to Penn Iron paid by such checks or cash. Although O'Brocta was responsible for the preparation of the corporate tax returns of his salvage company, he did not inform his accountants of the sales to Penn Iron, which were, consequently, not reported on the tax returns filed by the corporation for 1976, 1977, and 1978.[2]

O'Brocta's primary defense at trial was that he lacked the *mens rea* required for a criminal conviction because he believed that the failure to report cash payments was not improper and would not affect the computation of his tax liability. To support the latter contention, O'Brocta attempted to show that he used the cash received from Penn Iron to purchase scrap for his own business. He claimed that he never recorded these purchases and, consequently, that the cost of goods sold, as reported on the allegedly inaccurate returns, was understated by the same amount as the report of gross receipts. Thus, O'Brocta argued, he did not intentionally violate a known legal duty in understating gross receipts because he believed that he had fulfilled his legal obligation by accurately stating gross profits and correctly computing the income tax owed on this amount.

On appeal O'Brocta argues that the trial judge deprived him of the right to convince the jury that he lacked the intent necessary to conspire or to commit the substantive crimes. He charges that the trial court erred in not allowing him to elicit certain testimony from various witnesses and that

this error was compounded by the characterization of his defense as "spurious" in the judge's remarks to the jury. Finally, O'Brocta maintains that the conspiracy conviction cannot stand because the government has failed to prove that the IRS was actually impeded by the system of cash payments made to him or his corporation by Penn Iron.

## II.

The most troubling aspect of this appeal is the claim that the trial judge interfered with O'Brocta's attempt to persuade the jury of his innocence by characterizing his defense as spurious. That remark was made during the recitation of the jury instructions:

> There is a particular statute or two particular sections of the same statute that make the giving of the false information a violation of the law, regardless of whether there was any income tax to be paid or due, regardless of whether the United States suffered any loss or not. No pecuniary loss, no monetary loss, need be suffered by the United States. The violation of the statute is complete if it is shown that the Defendant deliberately and with knowledge that it was contrary to law gave a false account of any material item on the report. Gross receipts are material. There has been an admission here that gross expenditures were also falsely reported and an argument made that they should cancel each other out, and that is spurious, of course, in that it omits the consideration of inventory. If money is paid out to acquire goods, then those goods go into inventory, and so a false statement of any one of these things throws all the rest of the material on the return out of whack and unable to be understood.

App. at 548.

Immediately after these remarks, the judge explained that the jury must deter-

2. The unreported gross receipts of the corporation amounted to $90,469.48 in 1976, $74,820.01 in 1977, and $92,787.98 in 1978. O'Brocta signed the returns for 1977 and 1978; his brother signed the return for 1976. The returns bore the following preprinted statement above the

signature block: "Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete."

mine whether the defendant had "acted willfully, in the sense that he knew what he was doing was contrary to law, and he knew that the statements were false." "[N]o one should be convicted," the judge emphasized, "if he acted by mistake or inadvertence or some other reason. He has to know what he was doing and know that it was contrary to the requirements of law."[3] App. at 548–49. These remarks repeated an earlier and more specific reference to the intent requirement of the statutes under which O'Brocta was being prosecuted:

Do the facts which have been drawn before you, are the things which were done, consistent with a certain state of mind, which is the issue in this case? There is no dispute, there is no denial, that the tax return in question for the three years was false. The Defendant admits that it was, when it say [sic], "Total Receipts," that the total receipts weren't there, and that is undisputed. There is no dispute that the Defendant did not record all the receipts that he got. The dispute here is as to his state of mind, because that is an element of the crime for which he is charged, that he knowingly and willfully gave false information.

App. at 528.

The most explicit or at least the most complete explanation of the elements of the crimes with which O'Brocta was charged came later:

If you find beyond a reasonable doubt, from all the evidence in the case, that the Defendant willfully signed the tax returns for 1977 and '78, that the return was false as to a material matter, and that he knew that the false return was false, then the offense is completed.... [W]ith respect to the '76 return, you must find that the Defendant aided or assisted in or procured or advised the preparation of a return, that the return was false as to a material matter, and that the Defendant did it willfully, that is, knowing that it was contrary to law, knowing that it was false....

The terminology as used in this statute means that the acts are done voluntarily and purposefully, and not because of a mistake or accident or some other innocent reason....

So remember that the critical element in this case, and the only one in real dispute, is the mental state of the Defendant, that it must be shown that he willfully did the act, knowingly doing something which he knows the law forbids.... If the evidence leads you to conclude that the Defendant acted in good faith in order to conform to the law, that would not meet the test of willfulness. The Government must prove the Defendant's conduct in supplying the allegedly false information to his accountant was willfully done, with the specific intent to violate what he knew his legal

3. Immediately before the remark in question, the trial judge explained to the jury that:

It is only as to the last element that there is a substantial dispute between the parties, and that has to do with the mental element. The Government must prove from the evidence that the Defendant did not believe the tax return to be a true and correct report as to a material matter. If the Defendant willfully understated gross receipts in a substantial manner, in a substantial amount, such an understatement constitutes a false material matter.

... This is not, as you may surmise from various arguments about the admission of evidence, a charge of tax evasion. It is solely a charge of making a false report, materially false in a substantial amount, and that is all that is required, except that it must be done

with the mental state that it is willfully and knowingly false.... Now, the essential element and the one which is the sole source of disagreement between the parties here is the word, "Willfully," in the statute, and the shortest definition of that, for the purpose of this case, is ... a voluntary, intentional violation of a known legal duty. It must be shown by the evidence that the Defendant knew that the information on the return was false and that he knew it was contrary to the law to furnish false information. This is the sum and substance of what we call the mental state that is required to be proven, and it is stated in a few words: he knowingly gave the false information, knowingly, in the sense that he knew it was wrong and that he knew that to give wrong information violated the law.

App. at 546–48.

duty to be. He must be shown to have acted voluntarily and intentionally to violate a known duty. The evidence must show that James O'Brocta knew that his conduct was unlawful, that a particular act or failure to act here was a violation of the law.

You may consider all these matters. You may consider if he acted because he, in truth and honesty, believed that his offsetting of purchases would offset the cash received not reported, made his act without any tax consequences. Then, you may consider that in connection with the willfulness.

Is there evidence here which raises a doubt that he acted willfully about any fact by which is shown in the evidence to excuse that state of mind? Did he, in good faith, believe that the method of offsetting expenses that he has testified to rendered it unnecessary for him to give truthful reports? Then, you may consider that for the purpose of determining whether he acted willfully.

So, in summation, a conviction of willful violation of the tax laws must show an intentional violation of a known legal duty, which the Government must prove beyond a reasonable doubt.

App. at 550–53.

■ We must determine on this appeal whether the trial judge's use of the word "spurious" in his charge, in light of the circumstances, constitutes reversible error. In order to assist the jury in its deliberations, the trial judge may, within certain limits, comment upon the evidence. *See Quercia v. United States*, 289 U.S. 466, 469, 53 S.Ct. 698, 698–99, 77 L.Ed. 1321 (1933). When doing so, however, the trial judge must not unduly influence the jury's decision, so as to deny the defendant his right to trial by jury. The Supreme Court has stated that

In charging the jury, the trial judge is not limited to instructions of an abstract sort. It is within his province, whenever he thinks it necessary, to assist the jury in arriving at a just conclusion by explaining and commenting upon the evidence, by drawing their attention to the parts of it which he thinks important; and he may express his opinion upon the facts, provided he makes it clear to the jury that all matters of fact are submitted to their determination.

*Quercia*, 289 U.S. at 469, 53 S.Ct. at 699. The Supreme Court added:

The privilege of the judge to comment on the facts has its inherent limitations. His discretion is not arbitrary and uncontrolled, but judicial, to be exercised in conformity with the standards governing the judicial office. In commenting upon testimony he may not assume the role of a witness. He may analyze and dissect the evidence, but he may not either distort it or add to it. His privilege of comment in order to give appropriate assistance to the jury is too important to be left without safeguards against abuses. The influence of the trial judge on the jury "is necessarily and properly of great weight" and "his lightest word or intimation is received with deference, and may prove controlling." This Court has accordingly emphasized the duty of the trial judge to use great care that an expression of opinion upon the evidence "should be so given as not to mislead, and especially that it should not be one-sided"; that "deductions and theories not warranted by the evidence should be studiously avoided."

*Id.* at 470, 53 S.Ct. at 699 (quoting *Starr v. United States*, 153 U.S. 614, 626, 14 S.Ct. 919, 923, 38 L.Ed. 841 (1894)).

■ There is no bright line separating remarks that are appropriate from remarks that may unduly influence a jury. Although not explicitly articulated, this Court has balanced a number of factors and has employed what might be termed a sliding scale approach to assess the propriety of a trial judge's comments during a charge to the jury. Specifically, this Court has considered four factors: the materiality of the comment, its emphatic or overbearing nature, the efficacy of any curative instruction, and the prejudicial effect of the com-

ment in light of the jury instruction as a whole.

On appeal, the materiality of the challenged comment is a preliminary focus of inquiry. The reviewing court should be more concerned with a comment on a matter central to the defense than with a comment on a tangential issue. *See United States v. Anton*, 597 F.2d 371, 374 (3d Cir.1979). The fact that the judge in *Anton* commented on the defendant's credibility, an issue "central to his defense," was one factor in this Court's reversal of the conviction. *Id.*

A second consideration for the reviewing court is the strength of the challenged comment. The reviewing court must be concerned with "emphatic or overbearing remarks" that a jury may accept as controlling. *United States v. Gaines*, 450 F.2d 186, 189 (3d Cir.1971). For example in *Anton*, 597 F.2d at 372–73, the trial judge commented that he regarded the defendant *"as devoid of credibility"* and that he did *"not believe [defendant] absolutely and in all respects."* [4] Thus, in *Anton*, the emphatic nature of the judge's statement provided a second ground for the reversal of the jury verdict. *Id.* at 374. However, a statement that questions the validity of an assertion, but does not flatly or emphatically dismiss the testimony, is of less concern. *See, e.g., United States v. Blair*, 456 F.2d at 514, 519 (3d Cir.1972); *Gaines*, 450 F.2d at 188–89.

The efficacy of any curative instruction must also be considered. In many cases, a trial judge's comment which potentially could constitute reversible error can be counterbalanced by a curative instruction. *See, e.g., Blair*, 456 F.2d at 519. For such an instruction to be effective, the judge should clearly explain to the jury that it is free to disregard his remarks and must determine the facts and decide the case on its own. Both the number and clarity of such instructions are to be considered.[5]

Finally, the reviewing court must assess the prejudicial effect of the comments in light of the jury instruction as a whole. A potentially prejudicial comment cannot be evaluated in isolation, out of context. Rather, the reviewing court must examine the entire jury instruction to assess the true impact of the challenged remark. *See Gaines*, 450 F.2d at 190.[6]

Under the sliding scale approach the reviewing court must balance the above-mentioned factors. The stronger the potential prejudicial effect of a statement is, the stronger must be the mitigating factors. There may be cases in which the trial judge's comments are so out of bounds that no cautionary instruction to the jury could remove their prejudicial effect. For example, in *Anton* this Court held that the judge's statement of utter disbelief as to the defendant's credibility constituted reversible error. Despite clear curative statements before and after the comment,

---

**4.** Another example of an overly emphatic judicial statement is found in *Stevens v. United States*, 306 F.2d 834, 838 (5th Cir.1962) in which the court reviewed a statement by the trial judge who stated:

> All right, I don't believe I want to hear any more testimony from this witness. I want to certify in the record that the Court wouldn't believe him on oath, and I don't want to waste the jury's time taking any more testimony from him.

*See also Gaines*, 450 F.2d at 192 (quoting *Stevens* ).

**5.** While the repetition of a curative instruction by itself is not determinative of the power to remove the prejudice, such repetition may be helpful. In *Gaines*, for example, the trial judge

told the jury six times during his charge that it had to make the ultimate adjudication in the case. *Id.* at 190.

**6.** Another relevant factor for an appellate court to consider in assessing the nature of a judge's comments is the presence of any bias by the judge towards either of the parties. *Cf. United States v. Kravitz*, 281 F.2d 581, 584–85 (3d Cir. 1960) (noting the judge's comments were not "venomous"), *cert. denied*, 364 U.S. 941, 81 S.Ct. 459, 5 L.Ed.2d 372 (1961). In the present case, there is nothing to indicate any prejudice on the part of the trial judge against O'Brocta. In fact, the judge used his discretion to suspend O'Brocta's sentences of incarceration and to order probation instead.

the Court stated that "[where] a court has expressed its opinion on a pivitol issue in the case, and has expressed that opinion in a strong, unequivocal and one-sided fashion, abstract instructions regarding the jury's role as fact finder are not a sufficient remedy." *Anton,* 597 F.2d at 375; *see also Quercia v. United States,* 289 U.S. 466, 469–72, 53 S.Ct. 698, 698–700, 77 L.Ed. 1321 (1933) (judge's comment, in reference to defendant, that " 'wiping' one's hands while testifying was 'almost always an indication of lying' " constituted reversible error). In cases in which the prejudicial effect of a judicial comment is not so egregious as to be uncorrectible, the appellate court must weigh the totality of the factors in determining whether the quantum of harm from a statement amounts to reversible error.

### III.

■ The test described above must now be applied to the trial judge's characterization of the defense testimony on parallel underreporting of gross income and gross expenditures as "spurious." It is important to note that the charge against O'Brocta was not tax evasion, but the willful filing of inaccurate reports. Thus O'Brocta's state of mind, not the actual tax consequences of such a procedure, was at issue. The trial judge's comment on the effect of the underreporting might well have been intended merely to alert the jury that this line of defense was not particularly relevant to the charge against O'Brocta. Consequently, any prejudicial effect of the judge's comment was necessarily less than in *Gaines* in which the judge's remarks went to the core of the defense.

The trial judge's statement was also not nearly as strong as the statement of utter disbelief in *Anton.* The judge's opinion that the evidence was spurious is much closer in tone to the statement in *Blair* that the judge thought the money orders in

dispute had been altered. *See* 456 F.2d at 519.[7]

In addition to the fact that use of the word "spurious" had limited prejudicial effect, the judge issued a curative instruction to the jury in response to defense counsel's objection to its use:

> I have said, ladies and gentlemen, that the false statements on the returns and the false entries in the books are not in dispute. They have been admitted. The only question left is the question of mental state; that is, the willfulness.... With respect to the court's comment on whether or not the receipts of money and the expenditures of money and cash—I may have used the word "spurious." That is solely a conclusion that the court drew. You have heard the testimony of the Government's expert witness with respect to what the effect of the misstatement of both of those are on other matters here. The opinion of the court there that there is inventory is solely the opinion of the Court and does not bind the jury in any way as to whether or not that would be a logical contention to make, that these two cancel each other out.

App. at 559–60. This cautionary instruction is similar to one which the Court found to be sufficient in *Blair,* 456 F.2d at 519.

Finally, the judge's use of the word "spurious" must be evaluated in light of his entire charge. *See Gaines,* 450 F.2d at 190. In the present case, the judge repeatedly, and correctly, told the jury that its task was to determine whether O'Brocta willfully signed tax returns which he knew were false as to a material matter. The use of one ill-advised word within an entire charge to the jury does not, in this context, constitute reversible error.

Thus, whatever the limits of permissible judicial comment may be, the trial judge's comment in the case at bar did not transcend the boundary. While the Court does not endorse the judge's use of the word

---

**7.** The judge in *Blair* cured his statement by giving the jury a cautionary instruction. 456 F.2d at 519.

"spurious," it also does not find that under the test utilized today the inclusion of this one word amounted to reversible error.

## IV.

Additionally, we note that the defense failed to object to the effectiveness of the judge's curative instruction. According to Fed.R.Crim.P. 30,[8] it was incumbent upon defense counsel to request a further curative instruction or to register an objection to the efficacy of the one already presented to the jury before the jury retired to consider its verdict. The policy behind rule 30—to prevent needless retrying of cases when the defect complained of could have been cured at the first trial—is an important one. *See United States v. Currens,* 290 F.2d 751, 759 (3d Cir.1961).

Thus counsel's lack of a timely challenge to the efficacy of the judge's curative instruction, as required by rule 30, forecloses assigning as error that portion of the charge. Our decision today is in keeping with the spirit of *Currens.* In *Currens,* this Court noted the important procedural purpose of rule 30, but warned against employing it "woodenly" so as not to become a "trap for the unwary." *Currens,* 290 F.2d at 759. The defense strategy in *Currens* was based on the Durham formula for insanity, yet the trial judge refused the defense's request to utilize this standard in his charge to the jury. The defense's challenge to the judge's instructions was somewhat vague. However, because the entire defense was based on the Durham formula, and the trial judge instructed the jury according to the M'Naghten Rule, we held that rule 30 did not bar defendant's appeal.

The present case is quite different. Defense counsel did object to the judge's use of the word "spurious," but not to the efficacy of his curative instruction. These two points, while related, are different. An appellate court could have ruled for the defendant on either of these grounds separately; thus both points had to be preserved for appeal. As in *Anton,* we might have found the judge's comment to be so prejudicial that no cautionary instruction could have removed the taint. Conversely, we could have found that the judge's remark was sufficiently prejudicial to require a cautionary remark but that the cautionary remark made by the judge was inadequate. In the latter case, the policy behind rule 30 mandates that defendant raise an objection at trial so that a second trial might be avoided. In light of the totality of the circumstances, the judge's remark did not amount to reversible error.

## V.

O'Brocta also argues that he was deprived of an adequate opportunity to persuade the jury of his innocence as a result of the trial judge's decision not to allow certain questions to be put to government and defense witnesses. In general, the trial court's rulings precluded extensive inquiry into two matters: 1) the effect on tax liability of equally underreported receipts and purchases, and 2) the results of the government's efforts to locate the funds O'Brocta had not reported in his tax returns.

On cross-examination, defense counsel sought to question O'Brocta's accountant and Special Agents Busse and Waldemarson about the tax consequences of using unreported gross receipts to make unreported purchases of scrap metal. Waldemarson was permitted to testify that equal, unreported receipts and purchases would lead to a correct computation of gross profits on an income tax return. Busse was allowed to testify that O'Brocta had informed him that the Penn Iron payments "were used for cash purposes and [therefore] netted out." App. at 272. Nevertheless, it is true that the trial court generally limited inquiry into this area, having con-

---

**8.** Fed.R.Crim.P. 30 provides (in pertinent part) that

[n]o party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.

cluded that such questioning was irrelevant.[9]

▮ It is well settled that a tax deficiency is not an element of the offenses with which O'Brocta was charged. *See, e.g., United States v. Cohen*, 617 F.2d 56, 58 (4th Cir.), *cert. denied*, 449 U.S. 845, 101 S.Ct. 130, 66 L.Ed.2d 55 (1980); *United States v. Johnson*, 558 F.2d 744, 746 (5th Cir.1977), *cert. denied*, 434 U.S. 1065, 98 S.Ct. 1241, 55 L.Ed.2d 766 (1978). As these cases reveal, evidence of tax liability is generally inadmissible in prosecutions under I.R.C. § 7206, and a trial judge is certainly correct in taking care that a jury does not misperceive a charge of false reporting as an allegation of tax evasion. Moreover, as the district court repeatedly emphasized, the sole issue at trial was O'Brocta's state of mind when he helped prepare or signed the incorrect tax returns. If the returns were submitted in good faith, the defendant would be entitled to an acquittal on the charges specified in the indictment, whether or not his tax liability had been correctly computed. Conversely, if the defendant knowingly and willfully filed incorrect returns in violation of a legal duty, he would be guilty of the offenses charged, again regardless of the tax consequences of the inaccurate information. Particularly since defense counsel was permitted to make the somewhat questionable point about the effect of dual underreporting on tax liability,[10] we can perceive no error in the trial judge's decision to limit testimony on this issue.

▮ O'Brocta also asserts that he was not allowed to testify fully that he had not converted the unreported gross receipts to his personal use and that he was not permitted to question Agent Busse about the government's efforts to locate these receipts. During direct examination, O'Brocta did testify at length about his spartan lifestyle.[11] The trial court properly terminated this testimony after the prosecution objected on the grounds of irrelevance and repetitiveness. The questions to Agent Busse as to the government's failure to locate the unreported funds were likewise irrelevant to O'Brocta's defense because they only peripherally bore on his state of mind in filing an incorrect tax statement and had the potential of confusing the members of the jury into thinking that the case before them turned on tax evasion. We can find no error in the trial court's evidentiary rulings.

## VI.

▮ Count I of the indictment charges O'Brocta with conspiring with several other defendants to defraud the United States by impeding the IRS' efforts to ascertain and assess revenue through a scheme designed to conceal "the true nature and correct amounts of monies paid by Penn Iron ... for the purchase of scrapmetals." O'Brocta claims that the conspiracy conviction must fall because the government has not proven that the IRS was impeded by the cash payment scheme.

O'Brocta insists that the Internal Revenue agents who prepared the case against him were not impeded by the checks drawn to the order of fictitious payees. By examining those checks and comparing them

---

9. O'Brocta was charged with conspiring to defraud the United States by impeding the IRS's efforts to ascertain and collect revenue in violation of 18 U.S.C. § 371 and willfully assisting in the filing of and subscribing to false corporate income tax returns in violation of IRC § 7206. O'Brocta was not charged with tax evasion.

10. Busse and Waldemarson were not the only witnesses to testify as to the effect of underreporting on tax liability. Frederick Kern, an accountant hired by O'Brocta, was cross-examined extensively on this issue. App. at 228–31. In a supplemental memorandum submitted to the Court, the government questions the conclu-

sion that equal underreporting has no tax consequences. We do not find it necessary to address this matter in resolving the issues raised on appeal.

11. He testified that he last took a vacation when he got married, that he owns one car and one truck, that he never gambles in Las Vegas, that he does not "run around with other women," that he works six or seven days a week, that he does not own lavish furniture, and that there is no place in his home town to spend the large amount of income that went unreported.

with invoices Penn Iron regularly kept as part of its business records, the agents were indeed able to identify with apparently relative ease those sellers of scrap metal paid by means of the check cashing scheme. But to say that a fruitful investigation absolves those who participated in the scheme is equivalent to saying that a conspiracy must be successful before it becomes illegal. The illegality of a conspiratorial agreement, however, does not depend on the conspirators' achieving their end; even the objective impossibility of attaining the goals of a conspiracy is irrelevant to the guilt of those who conspire. *See United States v. Jannotti,* 673 F.2d 578, 591 (3d Cir.1982) (en banc), *cert. denied,* 457 U.S. 1106, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982). Consequently, we are not persuaded by the argument that the conviction for conspiracy cannot stand because the government was not actually impeded in its efforts to assess and collect revenue.

## VII.

For the reasons explained above, the judgment of the district court will be affirmed.

SAROKIN, District Judge, dissenting:

I respectfully dissent because the court below gave with one hand a fair and accurate jury instruction, and took back with the other that which it had given.

The majority opinion recognizes as "the most troublesome aspect of this appeal" the claim that "the trial judge interfered with O'Brocta's attempt to persuade the jury of his innocence by characterizing his defense as spurious. Majority op. at 266. The court refuses to "endorse the judge's use of the word 'spurious,'" which it labels "ill-advised," *id.* at 271, but holds that the use of such word does not constitute reversible error. The majority adds that defendant did not adequately preserve the entire issue for appeal, when he failed to object to the curative instruction given by the district court. *Id.* at 271–272.

In arriving at the conclusion that the trial judge did not deprive defendant of his right to a trial by jury by describing the sole defense asserted as "spurious," the majority acknowledges that, while courts may comment on the evidence adduced at trial, their discretion in doing so is not unlimited, especially in light of the great influence they have with the jury. *Quercia v. United States,* 289 U.S. 466, 470–72, 53 S.Ct. 698, 699–700, 77 L.Ed. 1321 (1933). The Court recognizes that "[t]here is no bright line separating remarks that are appropriate from remarks that may unduly influence a jury," and establishes a four-pronged balancing test, or "sliding scale approach" to assess the propriety of such comments. Majority at 268. Thus, the materiality of the judicial comment, its emphatic or overbearing nature, the efficacy of any curative instruction and the prejudicial effect of the comment in light of the jury charge as a whole are to be balanced one against the other: "[t]he stronger the prejudicial effect of a statement is, the stronger must be the mitigating factors." *Id.* at 269.

For the most part, the test set forth by the majority clearly and accurately restates the law as previously formulated by this Court. Indeed, the first three prongs of the analysis are derived directly from the Court's recent discussion of this issue in *United States v. Anton,* 597 F.2d 371, 375 (3d Cir.1979), quoting *United States v. Gaines,* 450 F.2d 186, 189 (3d Cir.1971), *cert. denied,* 405 U.S. 927, 92 S.Ct. 978, 30 L.Ed.2d 801 (1972). It is the fourth prong of the test here enunciated that is troubling, not so much in its formulation as in its application by the majority. In the abstract, there is no question but that the reviewing court should assess "the prejudicial effect of the comments in light of the jury instruction as a whole." Majority at 269. However, the majority here utilizes this common-sense notion to find that, in light of the correctness of the remainder of the trial judge's charge, the court's comments cannot be found to be reversible error. Indeed, both in its rendition of the facts and its legal analysis, the majority gives great weight to the fact that, other

than the comment here at issue, the district court's instructions were correct. *Id.* at 266–268. This is a conclusion with which I agree. However the accuracy of the charge on the law is essentially irrelevant to the issue of the appropriateness of judicial commentary on the evidence. Indeed, were the instructions incorrect, then they would provide an independent basis for reversal and eviscerate the need for this inquiry; it is their very correctness that requires the appellate court to examine the problem created by judicial comment.[1] The question that must be asked is not the extent to which the charge as a whole was wrong but whether in commenting upon the evidence the trial court exercised appropriate restraint in light of the materiality of the evidence addressed, and gave an effective curative instruction, assuring the jury that it was not bound by the court's factual conclusions. That the remainder of the charge was correct should begin, rather than end the inquiry.

However, having established a standard of review, the majority then proceeds to misapply it, as to each of the four prongs set forth. First, the majority distinguishes the instant matter from *Gaines,* in which, it says, "the judge's remarks went to the core of the defense." In so doing, the majority speculates that "[t]he trial judge's comment on the effect of the underreporting might well have been intended merely to alert the jury that [the argument that there were no actual tax consequences of defendant's actions] was not particularly relevant to the charge against O'Brocta." Majority at 271.

The majority's argument that the trial court's comments did not go to the core of

the defense is utterly without merit. In fact, the trial court's charge disparaged defendant's *sole* defense, that he believed that the effect of underreporting certain income was, in light of what he claimed to be on equal underreporting of certain expenditures, not illegal, since there was to be no effect on his tax bill. Defendant thus claimed that he lacked the *mens rea* required for a criminal conviction under 26 U.S.C. § 7206. *See generally United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 23–24, 50 L.Ed.2d 12 (1976); *United States v. Bishop,* 412 U.S. 346, 360–61, 93 S.Ct. 2008, 2017–18, 36 L.Ed.2d 941 (1973) (the *mens rea* requirement "implements the pervasive intent of Congress to construct penalties that separate the purposeful tax violator from the well-meaning, but easily confused, mass of taxpayers"). The district court, while charging this *mens rea* requirement properly, then stated in no uncertain terms:

> There has been an admission here that gross expenditures were also falsely reported and an argument made that they should cancel each other out, and that is spurious of course, in that it omits the consideration of inventory.

The effect of this statement on defendant's case must have been devastating: the trial court judge appeared to be saying to the jury that he regarded defendant's argument, and with it, his whole defense, as "spurious." In so doing, he also expressed his opinion as to defendant's credibility, for such defense had been established primarily by defendant's own testimony. App. at 408–413. And he did so by injecting into the case an issue not otherwise charged, explained, or presented to the jury by ei-

---

1. The majority cites *United States v. Gaines, supra,* 450 F.2d at 190, for the proposition that "the reviewing court must assess the prejudicial effect of the comments in light of the jury instructions as a whole." *Gaines* states simply that a particular comment was not an abuse of the trial court's discretion "viewed in light of [the] complete charge." *Id.* However, the *Gaines* Court apparently referred not to the substantive correctness of the legal charge there propounded to the jury, which is never discussed, but to the immediate context of the

judge's remarks, 450 F.2d at 188–89, as well as his repeated instructions to the jury as to their role as sole determiners of credibility and fact. *Id.* at 190–91 and n. 9. Here, the majority cannot and does not rest its conclusion on such a limited context, but on the charge as a whole, which it finds to be correct, particularly as to willfulness. Such correctness can be, and was, undermined by the trial court's comments, which were neither properly restrained, nor effectively neutralized, as in *Gaines.*

ther party, precisely as in *Quercia*. 289 U.S. at 471–72, 53 S.Ct. at 699–700. The court thus demolished defendant's sole defense, destroyed his credibility and did so in a manner unsusceptible of review by a jury unfamiliar with the basis of the court's conclusion. While it is true, as the majority suggests, that the charge may have been intended to let the jury know that, in fact, understating both gross receipts and cost of goods sold does not create a correct tax return,[2] it is equally true that the jury may have interpreted the court's comment to mean that *as a matter of law*, the sole defense asserted was "spurious." At the very least, the charge indicated in the clearest of terms the judge's skepticism of defendant's case. To say, as the majority does, that it did not involve a material aspect of the case is to cast aside all of what defendant was attempting to prove. Furthermore, to the extent that the court's comment bore on defendant's credibility, upon which any good faith defense must rest, it also improperly intruded on the jury's province. *Anton, supra*, 597 F.2d at 374–75.

Second, the majority concludes that the court's statement was not strong enough to warrant reversal. If this is true, it is hard to imagine what would be strong enough. "Spurious" is defined as "outwardly similar or corresponding to something without having its genuine qualities: false, counterfeit," "faulty in reasoning or conclusion: illogical, specious," or "irrelevantly inapplicable: lacking correspondence to reality: vaguely ambiguous: pseudo." *Webster's Third New International Dictionary of the English Language Unabridged* at 2212 (1976). To label one's sole defense, or the facts relied upon by defendant which comprised such defense, false, fraudulent, specious or lacking correspondence to reality

is a strong statement indeed, not very different in vehemence or, ultimately, in content from the statement that "[t]he court— that is, the trial judge—regarding [defendant] as devoid of credibility, and I do not believe [him] absolutely and in all respects" found to constitute reversible error in *Anton*, 597 F.2d at 372–73. Here too the language was strong, attacking the gravamen of the defense asserted, and impugning defendant's credibility, without such qualifying statement as had followed in *Anton*.[3] It is a statement which did not question a particular assertion of defendant, as in *United States v. Blair*, 456 F.2d 514, 519 (3d Cir.1972), for defendant here did not assert that, in fact, receipts and costs of goods sold cancel each other out. Rather, the trial court's statement denigrated defendant's *belief* that such cancelling out occurs, the sole issue before the jury. Such "emphatic and overbearing" remarks must be viewed as an intrusion upon defendant's right to a jury trial, and as such, reversible error.

Nor was the curative instruction given by the district court adequate to dissipate the taint created by the court's prior comment. To the contrary, that instruction re-emphasized that the spuriousness of defendant's defense was the court's "conclusion":

> With respect to the court's comment on whether or not the receipts of money and expenditures of money and cash—I may have used the word "spurious." That is solely a conclusion that the court drew.

App. at 559. The court went on to re-state such conclusion in the context of re-establishing the jury's role as factfinder.

> The opinion of the court that there is inventory is solely the opinion of the court and does not bind the jury in any

---

2. The judge may have been correct that, under Internal Revenue Service regulations, cost of goods sold, as it is used in arriving at an income amount, must take inventory into account. *See* 26 C.F.R. 1.471–1. However, to state that the idea that cost of goods sole and income should cancel each other out is "spurious" insults defendant's belief that they did and thereby undermines his entire defense.

3. That qualifier, that "I do not believe [the defendant] absolutely and in all respects" was found not to constitute reversible error in *United States v. Kravitz*, 281 F.2d 581, 584–85 and n. 4 (3d Cir.1960), cited in *Anton, supra*, 597 F.2d at 373.

way as to whether or not that would be a logical contention to make, that those two cancel each other out.

App. at 560. Hence, the judge, while not limiting himself to the "abstract instructions regarding the jury's role as factfinder" found insufficient in *Anton, supra,* 597 F.2d at 375, gave a curative instruction which re-stated his "opinion" that defendant's good faith belief did not constitute "a logical contention to make." In so doing, the court made less than vigorous efforts to remind the jurors that the facts were theirs to find: it stated only that the court's "opinion" and "conclusion" did not "bind the jury in any way," a far weaker formulation than that utilized in *Blair,* where the court reminded the jury "you use your judgment, because yours prevails, not mine ... that is one of the facts you must determine ... no matter what I think, it is what you think that prevails." 456 F.2d at 519. Added emphasis and repetition in *Blair* may well have outweighed the district court's opinion expressed earlier, and reiterated after objection. Here, no such emphasis or repetition drove this point home to the jury, and the majority thus errs in describing the curative instruction given as "similar to one which the court found to be sufficient in *Blair.*"

Finally, the correctness of the remainder of the charge does not excuse the district court's single erroneous instruction where, as here, that instruction undermines all that came before and after it. This is especially so where the judge's reminders

to the jury that they were to find facts, both regarding willfulness and otherwise, were both fewer than in a case such as *Gaines,*[4] and weaker than in the other cases in which judicial comments have been addressed by this court.[5] For the Court nonetheless to find that the district court neutralized its highly prejudicial statement by virtue of sparse, lackluster and unenthusiastic admonitions, allows courts greater control over jury verdicts and paves the way for deeper inroads into the right to trial by jury than this Court has ever before allowed.

Moreover, in purporting to examine the judge's comment in context, the majority fails to account for the larger context out of which the jury charge, as a whole, grew. The record here reveals a trial judge who, throughout the trial, viewed defendant's case with a jaundiced eye. Originally unaware of the defense being presented, App. at 165–66, the court interpreted the defense narrowly throughout, often in the presence of the jury, (*e.g.,* App. at 275), and as late as the last day of trial, stated that the intent at issue was "to make a false report, knowing the law requires it.' App. at 461.[6] While I agree with the majority that the district court's rulings as to the relevancy of evidence did not constitute an abuse of the broad discretion accorded a trial judge by Federal Rule of Evidence 403, *see, e.g., United States v. Clifford,* 704 F.2d 86, 89 (3d Cir.1983), nor are they commendable in the context of a clear pattern of skepticism toward defendant's case. Finally, it should

4. In *Gaines,* the district court "repeatedly" told the jury that it was the finder of facts. Such instruction was only given three times in this case, including the curative instruction. App. at 525, 548, 560.

5. Here, immediately following the comment here at issue, the district court stated:
It is for you, the jury, to determine from all the facts, all of the surrounding circumstances, whether the defendant, with respect to the three charges, acted willfully, in the sense that he knew what he was doing was contrary to law, and he knew that the statements were false.
App. at 548–49. This instruction is far less emphatic than those approved by the court in *Gaines,* 450 F.2d at 188–89, and *Blair,* 456 F.2d

at 519, as to the principle that it is the jury's and not the court's role to find the facts, especially those facts upon which the court just commented. Indeed, it is not even as effective as that found insufficient in *Anton,* where the district court had reminded the members of the jury that they were the "*sole* judges of credibility" (emphasis supplied), that his comments were "only the expression of [his] opinion," and that "at all times ... you, as jurors, are at liberty to disregard all comments of the court in arriving at your own findings as to the facts." 597 F.2d at 373.

6. *See also* App. at 487 (THE COURT: I really enjoyed [O'Brocta's] last remark .... We were brought up to be honest.")

be noted that the district court did not allow counsel an opportunity to review, or object to, much of the charge to be given prior to such instructions, which were to be adaptations of the government's proposed charges, put in the court's own language (481a–484a). Of course, no prior mention was made of the court's intention to label defendant's defense as "spurious."

The Court today not only seeks to expand the parameters of permissible judicial behavior, moving away from a sensible trend against the type of judicial commentary here allowed, and thus to contract the constitutional jury trial right guaranteed to all criminal defendants, but it does so, in part, by the needless formalism of holding that defendant did not properly preserve the issue for appeal. This conclusion is also without basis. After the district court had completed its jury instructions, counsel for defendant objected clearly and articulately to the instruction given. App. at 556. This satisfies the requirement imposed by Federal Rule of Criminal Procedure 30. The majority, however, states that defendant did not properly preserve his right to object to the curative instruction as well by failing to object to that instruction after it was given.

This Court, in seeking to balance the salutary purposes that underlie Rule 30, and the potential for its degeneration into "a trap for the wary, a trap reminiscent of the senseless technicalities that characterized common law procedural systems ...," has never before required that a party object to both a jury instruction and to the curative instruction that follows. *See United States v. Currens*, 290 F.2d 751, 758–59 (3d Cir.1961) (failure to object to supplemental charge did not insulate issue from appeal). To so require where, as here, the issues raised by the two sets of instructions are not only inextricably intertwined but, under the majority's formulation, necessary parts of the same analysis, is to place unnecessary hurdles in the way of the litigant who seeks resolution of what is essentially one problem. Indeed, the majority here proposes a delicate balancing test, in which prejudice is to be weighed

against the efficacy of a curative instruction, but then mandates that in order to invoke that test in its entirety, a defendant must object not once by twice. The unfairness of such a result is highlighted here, where the district court failed even to give counsel an opportunity to object to the supplemental charge, *see* App. at 560, a charge which was the culmination of a series of events to which counsel had unequivocally objected. Had he objected yet one more time, there is little reason to believe that the trial court would have corrected its error, or even had been able to do so. Moreover, it should be noted that the Court here reaches out to bar defendant's appeal, although the issue was never raised by the government, which briefed and argued this issue as though properly preserved *in toto*. Appellee's Brief at 21–22. *See Currens, supra*, 290 F.2d at 760–61. The Court thus goes out of its way to reach a result not only discordant with its previous caselaw, but predicated upon a position never asserted by the government.

This is, after all, a case in which a trial court judge properly charged the jury as to a perfectly valid defense raised by a defendant, and then undermined that charge by telling the jury that, based upon his own theory of the case, that defense was spurious. That he told the jury a few times that the decision was theirs to make—once while reiterating that the spuriousness of the defense was his "conclusion" and "opinion"—did not dilute the effect of his earlier statements: that, in effect, he thought defendant was guilty and that defendant's testimony could not be believed. The majority here ignores reality in suggesting that the jury was nonetheless free to make its own, independent decision.

For a court thus to ridicule the sole defense asserted and reiterate its view after appropriate objection is to deny defendant his right to a fair trial by jury. Recognizing that it is not wholly inappropriate for courts to comment on the evidence adduced at trial, the majority here abandons the limiting principles that have previously been imposed on this practice by this Court

and goes well beyond its holdings in prior cases regarding the propriety of judicial comment on the evidence in a criminal trial. In so doing, the Court not only fails to recognize the inherent influence that such comments may have on jury deliberations, but also disregards the stringent requirement that a trial judge not have "abandoned his proper role" and "reached the point where 'it appears clear to the jury that the court believed the accused is guilty.'" *United States v. Beaty,* 722 F.2d 1090, 1093 (3d Cir.1983) (citing cases).

Even those precedents which permit a judge to express his or her views on credibility and suggest that a jury properly instructed can or will ignore such comments from the court border on fantasy. But to conclude that based upon some boilerplate instructions, a jury can ignore the elevated, robed, experienced jurist who has stated that he believes the defense to be without factual or legal basis or both is to close our eyes to reality and transform a courtroom into a land of make believe.

I dissent.